UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| DOCTORS HOSPITAL AT RENAISSANCE, | : | |
| 5501 S. McColl Road | : | |
| Edinburg, TX 78539 | : | |
| | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| ALEX AZAR, in his official | : | CIVIL ACTION No. _____ |
| capacity as Secretary of the United States | : | |
| Department of Health and Human Services, | : | |
| 200 Independence Avenue, SW | : | |
| Washington, DC 20201 | : | |
| | : | |
| SEEMA VERMA, in her official | : | |
| capacity as Administrator, Centers for | : | |
| Medicare and Medicaid Services, | : | |
| 7500 Security Boulevard | : | |
| Baltimore, MD 21244 | : | |
| | : | |
| and | : | |
| | : | |
| CENTERS FOR MEDICARE AND MEDICAID | : | |
| SERVICES, | : | |
| 7500 Security Boulevard | : | |
| Baltimore, MD 21244 | : | |
| | : | |
| Defendants. | : | |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiff Doctors Hospital at Renaissance ("DHR") seeks declaratory and injunctive relief

against defendants Alex Azar, Seema Verma, and the Centers for Medicare & Medicaid Services

("CMS") for violations of the Medicaid Act and the Administrative Procedure Act ("APA").  In

support thereof, the plaintiff states as follows:

1

## INTRODUCTION

1.      Plaintiff DHR treats patients who are eligible to receive benefits from the Medicaid program, the medical assistance program established under Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.* (the "Medicaid Act").  Congress established the Disproportionate Share Hospital ("DSH") program under the Medicaid Act to help relieve the financial burden on certain hospitals that treat a disproportionate share of Medicaid and uninsured patients.  42 U.S.C. § 1396r-4.  Under the Texas State Medicaid Plan, plaintiff DHR qualifies to receive payments under the DSH program.

2.      The DSH program helps reimburse qualified hospitals for the treatment they provide to Medicaid and uninsured patients through payment adjustments.  42 U.S.C. § 1396r-4(g)(1)(A).  These payment adjustments may not exceed:  (1) the costs of services to individuals eligible for Medicaid, net of payments under the Medicaid Act (hereinafter the "Medicaid Shortfall"); plus (2) the costs of services to individuals who have no health insurance or other third-party coverage, net of payments by those uninsured patients.  *Id.*  The product of this statutory equation is known as a qualified institution's hospital-specific DSH payment limit.  The calculation of the Medicaid Shortfall is at issue in this case.

3.      The Medicaid Act expressly provides that, to calculate a DSH hospital's Medicaid Shortfall, only Medicaid payments are to be subtracted from costs.  42 U.S.C. § 1396r-4(g)(1)(A).

4.      Prior to the 2017 amendment that is challenged in this action, CMS's regulations similarly specified that only Medicaid payments are to be considered in the Medicaid Shortfall calculation.  73 Fed. Reg. 77904, 77950 (Dec. 19, 2008); *see* 42 C.F.R. § 447.299(c)(16) (2016) (the "2008 Rule").

5.      Without notice-and-comment rulemaking under the APA, CMS instituted and began enforcing a so-called "policy clarification" to the regulations contained in the 2008 Rule.

This "policy clarification" manifested itself most directly in or about early 2010 in a document responding to frequently asked questions ("FAQ") called "Additional Information on the DSH Reporting and Audit Requirements" posted on defendant CMS's website.[1]  The "policy" was set forth in responses to questions numbered 33 and 34.

6.       FAQ Nos. 33 & 34 indicated that DSHs must include in the calculation of their Medicaid Shortfall non-Medicaid payments such as private health insurance and Medicare payments, contrary to the plain language of 42 U.S.C. § 1396r-4(g)(1)(A) and the 2008 Rule.

7.       Because 42 U.S.C. § 1396r-4(g)(1)(A) and the 2008 Rule unambiguously require only Medicaid payments to be contained in the Medicaid Shortfall calculation, the policy clarifications set forth in FAQ Nos. 33 & 34 constituted substantive amendments to the statute, the regulations and the State Plan.  These substantive amendments were not authorized by Congress and were not promulgated using notice-and-comment rulemaking under the APA.

8.       In a separate action before this Court, the Court (Sullivan, J.) preliminarily enjoined the defendants "from enforcing, applying, or implementing FAQ No. 33." *Texas Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224, 247 (D.D.C. 2014).  In that case, the Court found that the plaintiffs had shown a likelihood of success on the merits of their claim that the policy referenced in FAQ No. 33 relating to private health insurance payments made "a substantive change to the formula for calculating a hospital's DSH limit," constituted final agency action, and had not been promulgated using the notice-and-comment provisions of the APA.  *Id.* at 241.

9.       Despite this unambiguous federal district court order addressing FAQ No. 33 and additional federal court orders reaching the same conclusions with respect to both FAQ Nos. 33

---

[1] *Available at* https://www.medicaid.gov/medicaid/financing-and-reimbursement/downloads/part-1-additional-info-on-dsh-reporting-and-auditing.pdf. (last accessed February 8, 2018).

and 34 (discussed below), the defendants continue to apply the policy referenced in FAQ Nos. 33 and 34 relating to the inclusion of Medicare and private health insurance payments in the calculation of a DSH's Medicaid Shortfall.

10.     Moreover, on April 3, 2017, defendants published the final version of a new rule that codifies the same illegal policies set forth in FAQ Nos. 33 and 34, effective June 2, 2017. 82 Fed. Reg. 16114, 16117 (April 3, 2017) (the "2017 Rule").  The 2017 Rule amends 42 C.F.R. § 447.299(c)(10), to "modify the terms of the current regulation to make explicit that 'costs' for purposes of calculating the hospital-specific limits are costs net of third-party payments."  *Id.*

11.     On February 9, 2018, the United States District Court for the Western District of Missouri held that the Medicaid Act "is unambiguous that the calculation of a DSH hospital's [hospital-specific limit ("HSL")] does not involve consideration of private insurance or Medicare payments, and a DSH hospital's total uncompensated costs of care for calculating the HSL is reduced only by the total of other Medicaid program payments."  *Missouri Hospital Assoc.* v. *Hargan*, No. 2:17-CV-04052-BCW, 2018 WL 814589, at *12 (W.D. Mo. Feb. 9, 2018). Granting summary judgment for the plaintiff on all counts, the court held that the 2017 "Final Rule is in excess of Defendants' statutory authority and the Final Rule is set aside."  *Id.*

12.     The Texas Health and Human Services Commission ("Texas HHSC") has indicated that FAQ Nos. 33 and 34 will require it to "recoup" millions of dollars of DSH funds lawfully distributed in State Fiscal Year ("SFY") 2012 to plaintiff DHR.

13.     On April 27, 2016, Texas HHSC notified DHR that the federally-mandated audit of payments for the 2012 DSH program year had determined that DHR had purportedly been overpaid in an amount of at least $7,302,349.00.  This notice contained a demand that DHR

repay the overpaid amount within 30 days or contact the Texas HHSC to request a repayment plan.

14.     The Texas HHSC, in a letter dated October 6, 2016 (and subsequently revised and replaced by a letter dated December 13, 2017), agreed to delay efforts to effectuate any recoupment of the alleged 2012 DSH program overpayment amounts from DHR, but only temporarily.  Texas HHSC's December 13, 2017 letter provides that the recoupment will resume on a highly expedited schedule if CMS defers or disallows federal funds to Texas on the grounds that Texas has not recouped the alleged overpayment from DHR.  Specifically, the letter provides that:  (1) within twenty business days after DHR's receipt of notice from Texas HHSC of such a deferral or disallowance of federal funds, DHR must enter a repayment plan with Texas HHSC for the full amount of the alleged overpayment; (2) the schedule in the repayment plan will establish that at least half of the entire alleged overpayment must be paid within ten business days of the date of the repayment plan; and (3) the other half of the alleged overpayment must be paid no later than six months after the date of Texas HHSC's notice of deferral or disallowance.

15.     There is currently no administrative process or legal avenue through which plaintiff can appeal the recoupment, which will become imminent upon the issuance of such a notice from Texas HHSC, or upon the occurrence of certain other triggers set forth in the letter. Moreover, once such funds are recouped and redistributed, there is no mechanism to recover the funds paid to other hospitals by the state.  Thus, once the funds are taken, plaintiff will have no recourse to recover the DSH Payments even if plaintiff fully prevails on the merits of its suit.

16.     Accordingly, if that recoupment is permitted to occur, it will adversely affect DHR and will in all likelihood ultimately require DHR to cut programs and services to its patient populations, including programs and services it provides to Medicaid patients.

17.     In addition, application of the policies referenced in FAQ Nos. 33 & 34 and in the 2017 Rule will also reduce by millions of dollars the amount of DSH funding plaintiff DHR may be entitled to receive in future years.  That DSH funding will be reallocated and forever lost to DHR absent appropriate intervention to preclude the improper application of the policies in the illegal FAQs and rule.  That unanticipated and irrevocable loss of significant additional funding will compound the irreparable harm DHR and its patient populations will face if the FAQs and rule are permitted to stand.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction over this action and personal jurisdiction over the parties pursuant to 28 U.S.C. § 1331, 28 U.S.C. §§ 2201, 2202, and 5 U.S.C. §§ 704 -706, as this action presents a case and controversy under the Medicaid Act, the APA, and the Declaratory Judgment Act, 28 U.S.C. § 2201.

19.     Venue lies in this district under 28 U.S.C. § 1391(e).

## PARTIES

20.     Plaintiff DHR is a general medical and surgical hospital with a principal place of business located at 5501 S. McColl Road, Edinburg, Texas.  DHR is a physician-owned health system that offers comprehensive medical care throughout the south Texas region.  DHR provides healthcare services to a disproportionately large number of uninsured patients, Medicaid patients, and other low-income patients with special needs, including patients eligible for both Medicaid and Medicare ("dual-eligibles").  DHR qualifies as a DSH under the Texas Medicaid Plan.  Defendants' illegal actions, requiring the miscalculation of the hospital-specific DSH payment limit for DHR, will deprive DHR of statutorily-authorized DSH payments totaling millions of dollars this year and each year thereafter.

21.     Defendant Alex Azar is the United States Secretary of Health and Human Services.  Defendant Azar, by and through his designees at CMS, undertook the illegal and unauthorized actions challenged in this case.  Defendant Azar is sued solely in his official capacity.

22.     Defendant CMS is the federal agency to which defendant Azar has delegated the authority pursuant to the Social Security Act to administer the Medicaid and DSH programs.  42 U.S.C. §§ 1396, *et seq.*

23.     Defendant Seema Verma is the Administrator of CMS.  CMS is the agency that administers the Medicaid program and the DSH program.  Defendant Verma is sued solely in her official capacity.

## FEDERAL STATUTORY AND REGULATORY FRAMEWORK

24.     The Medicaid program was established in 1965 as a cooperative venture between the federal and state governments "that provides medical care to needy individuals."  *Douglas v. Indep. Living Ctr. of S. Cal., Inc.*, 132 S. Ct. 1204, 1208 (2012).  It is designed to provide medical assistance to persons whose income and resources are insufficient to meet the costs of necessary care and services.

25.     The program "is funded jointly through federal and state funds."  *Consejo De Salud De La Comunidad De La Playa De Ponce, Inc., CDT v. Lorenzo Gonzalez-Feliciano*, 695 F.3d 83, 87 (1st Cir. 2012).

26.     State participation in the Medicaid program is voluntary.  Once states choose "to participate in Medicaid, [they] must rigidly comply with several federally-imposed requirements if they opt to do so."  *Id.*

27.     One of those federally-imposed requirements is that states "take into account (in a manner consistent with section 1396r–4 of this title) the situation of hospitals which serve a

disproportionate number of low-income patients with special needs" when setting hospital reimbursement rates.  42 U.S.C. § 1396a(a)(13)(A)(iv).

28.    This statute created "payment adjustment[s]" to hospital rates for qualifying hospitals.  42 U.S.C. § 1396r-4(c).  Those payment adjustments are available to hospitals that treat a disproportionate share of Medicaid patients.  42 U.S.C. § 1396r-4(b).

29.    Under the Medicaid Act, a DSH payment may not exceed:

[T]he costs incurred during the year of furnishing hospital services (as determined by the Secretary and net of payments under this subchapter, other than under this section, and by uninsured patients) by the hospital to individuals who either are eligible for medical assistance under the State plan or have no health insurance (or other source of third party coverage) for services provided during the year.

42 U.S.C. § 1396r-4(g)(1)(A).  This payment cap is known as the hospital-specific DSH payment limit.

30.    This statute does not reference private insurance payments or Medicare payments.

31.    To ensure that the hospital-specific DSH payment limit has been calculated correctly for each DSH, each state must provide an annual report and audit of its DSH program to CMS.  42 U.S.C. § 1396r-4(j).  This annual report must include:

A.    An identification of each disproportionate share hospital that received a payment adjustment under this section for the preceding fiscal year and the amount of the payment adjustment made to such hospital for the preceding fiscal year.

B.    Such other information as the Secretary determines necessary to ensure the appropriateness of the payment adjustments made under this section for the preceding fiscal year.

*Id*.

32.    In the 2008 Rule, the Secretary promulgated regulations interpreting this reporting requirement.  42 C.F.R. § 447.299 (2008).

33.    Those regulations require state annual reports to "present a complete, accurate, and full disclosure of all of their DSH programs and expenditures."  42 C.F.R. § 447.299(a).

34. They further require states to submit information "for each DSH hospital to which the State made a DSH payment." 42 C.F.R. § 447.299(c).

35. One piece of information each DSH hospital must submit for inclusion in the state annual report is its "total annual uncompensated care costs." The regulatory formula to determine such costs is as follows:

> The total annual uncompensated care cost equals the total cost of care for furnishing inpatient hospital and outpatient hospital services to Medicaid eligible individuals and to individuals with no source of third party coverage for the hospital services they receive less the sum of regular Medicaid [fee-for-service] rate payments, Medicaid managed care organization payments, supplemental/enhanced Medicaid payments, uninsured revenues, and Section 1011 payments for inpatient and outpatient hospital services. This should equal the sum of paragraphs (c)(9),(c)(12), and (c)(13) subtracted from the sum of paragraphs (c)(10) and (c)(14) of this section.

42 C.F.R. § 447.299(c)(16). A hospital's "total annual uncompensated costs" is the same as a hospital's "hospital-specific DSH payment limit."

36. The relevant regulations expressly define each type of cost and payment referenced in 42 C.F.R. § 447.299(c)(16). *See* 42 C.F.R. §§ 447.299(c)(6)-(15).

37. Prior to the 2017 amendment challenged in this action, 42 C.F.R. § 447.299(c)(6) - (16) did not reference private insurance payments or Medicare payments.

38. To verify the accuracy of these state annual reports, states must employ an independent auditor to audit the state's compliance with the federal DSH program. 42 U.S.C. § 1396r-4(j).

39. Those independent audits must verify, *inter alia*, that DSH payments made to each hospital comply with the applicable hospital-specific DSH payment limit. 42 U.S.C. § 1396r-4(j)(2).

40.     Overpayments identified by the audit "must be recouped by the state within one year of their discovery or the federal government may reduce its future contribution." *Texas Children's Hosp.*, 76 F. Supp. 3d at 230 (citing 42 U.S.C. § 1396b(d)(2)(C), (D)).

## CMS GUIDANCE

41.     CMS has developed guidance to help states understand how the hospital-specific DSH payment limit must be calculated.  *See* General DSH Audit and Reporting Protocol, CMS-2198-F.[2]

42.     This document provides the following specific guidance for the auditor with respect to calculating the Medicaid Shortfall:

> To determine the existence of the Medicaid Shortfall, Medicaid IP/OP hospital costs (including Medicaid managed care costs) must be measured against Medicaid IP/OP revenue received for such services in the audited State Plan rate year (including regular Medicaid rate payments, add-ons, supplemental and enhanced payments and Medicaid managed care revenues).

*Id*. at 3.

43.     This guidance does not reference private health insurance payments or Medicare payments.

44.     This guidance then provides a step-by-step guide to determine a hospital's hospital-specific DSH payment limit.  *Id.* at 5-10.

45.     Step 7 of this step-by-step guide specifies the payments that must be taken into account in calculating the Medicaid Shortfall component of the hospital-specific DSH payment limit.  It specifies in part:  "Hospitals report revenues from Medicaid managed care organizations, Medicaid payments from other States (regular payments including add-ons, supplemental and enhanced payments, DSH payments), and other non-State Medicaid payments."

---

[2] Available at https://www.medicaid.gov/medicaid/financing-and-reimbursement/downloads/general_dsh_audit_reporting_protocol.pdf (last visited February 8, 2018).

46.     It does not reference private health insurance payments or Medicare payments.

47.     CMS has also developed a form to be used to help calculate the hospital-specific DSH payment limit.[3]

48.     This form does not have data input columns for private health insurance or Medicare payments.

### FAQ Nos. 33 & 34

49.     On or about January 10, 2010, CMS posted answers to "frequently asked questions" regarding the federal audit and reporting requirements.  *See* Additional Information on the DSH Reporting and Auditing Requirements.[4]

50.     Question Number 33, and CMS's response thereto, states:

> **33.  Would days, costs, and revenues associated with patients that have both Medicaid and private insurance coverage (such as Blue Cross) also be included in the calculation of . . . the DSH limit in the same way States include days, costs and revenues associated with individuals dually eligible for Medicaid and Medicare?**
>
> Days, cost[s], and revenues associated with patients that are dually eligible for Medicaid and private insurance should be included in the calculation of the Medicaid utilization rate (MIUR) for the purposes of determining a hospital eligible to receive DSH payments.  Section 1923(g)(1) does not contain an exclusion for individuals eligible for Medicaid and also enrolled in private health insurance.  Therefore, days, costs, and revenues associated with patients that are eligible for Medicaid and also have private insurance should be included in the calculation of the hospital-specific DSH limit.

*Id.* at 18.

51.     Question Number 34, and CMS's response thereto, states:

> **34.  The regulation states that costs for dual eligibles should be included in uncompensated care costs.  Could you please explain further?  Under what circumstances should we include Medicare payments?**

---

[3]  Available at https://www.medicaid.gov/medicaid/financing-and-reimbursement/downloads/dshreportformat.pdf (last accessed February 8, 2018).
[4]  Available at https://www.medicaid.gov/medicaid/financing-and-reimbursement/downloads/part-1-additional-info-on-dsh-reporting-and-auditing.pdf. (last accessed February 8, 2018).

Section 1923(g) of the Act defines hospital-specific limits on FFP for Medicaid DSH payments. Under the hospital-specific limits, a hospital's DSH payment must not exceed the costs incurred by that hospital in furnishing services during the year to Medicaid and uninsured patients less payments received for those patients. There is no exclusion in section 1923(g)(1) for costs for, and payment made, on behalf of individuals dually eligible for Medicare and Medicaid. Hospitals that include dually-eligible days to determine DSH qualification must also include the costs attributable to dual eligibles when calculating the uncompensated costs of serving Medicaid eligible individuals. Hospitals must also take into account payment made on behalf of the individual, including all Medicare and Medicaid payments made on behalf of dual eligibles. In calculating the Medicare payment for service, the hospital would have to include the Medicare DSH adjustment and any other Medicare payments (including, but not limited to Medicare IME and GME) with respect to that service. This would include payments for Medicare allowable bad debt attributable to dual eligible.

*Id.*

52.   Despite the fact that there is no reference to private health insurance or Medicare payments in 42 U.S.C. § 1396r-4(g)(1)(A), the 2008 Rule, CMS's initial guidance, and the form CMS has provided for the calculation of the hospital-specific DSH payment limit, the policies contained in FAQ Nos. 33 & 34 purport to require the inclusion of private health insurance and Medicare payments in the calculation of the Medicaid Shortfall component of the hospital-specific DSH payment limit.

## THE 2017 CMS RULE

53.   On April 3, 2017, despite multiple federal court rulings (discussed below) invalidating FAQ Nos. 33 and 34, defendants published the final version of the 2017 Rule, which essentially codifies the content of FAQ Nos. 33 and 34. The rule amends 42 C.F.R. § 447.299(c)(10), to "modify the terms of the current regulation to make explicit that 'costs' for purposes of calculating the hospital-specific limits are costs net of third-party payments." *Id.*

54.   The regulation governing how costs must be considered in the calculation of the DSH hospital-specific limit therefore now provides:

12

(10) Total Cost of Care for Medicaid IP/OP Services. The total annual costs incurred by each hospital for furnishing inpatient hospital and outpatient hospital services to Medicaid eligible individuals. The total annual costs are determined on a hospital-specific basis, not a service-specific basis. For purposes of this section, costs-

(i) Are defined as costs net of third-party payments, including, but not limited to, payments by Medicare and private insurance.

(ii) Must capture the total burden on the hospital of treating Medicaid eligible patients prior to payment by Medicaid. Thus, costs must be determined in the aggregate and not by estimating the cost of individual patients. For example, if a hospital treats two Medicaid eligible patients at a cost of $2,000 and receives a $500 payment from a third party for each individual, the total cost to the hospital for purposes of this section is $1,000, regardless of whether the third party payment received for one patient exceeds the cost of providing the service to that individual.

42 C.F.R. § 447.299(c)(10).

55.     The 2017 Rule became effective on June 2, 2017 and will be enforced by defendants on a nationwide basis.

56.     The policy contained in the 2017 Rule—of including private insurance payments and Medicare payments in the hospital-specific limit calculation—is not embodied in the 2008 Rule.  The 2017 Rule is thus a substantive new rule that cannot have retroactive effect.

57.     Like FAQ Nos. 33 and 34, the 2017 Rule unlawfully lowers the hospital-specific limit on DSH payments, in direct conflict with 42 U.S.C. § 1396r-4.

**DSH LITIGATION IN THIS COURT**

58.     At least five actions have been filed with this Court challenging the policies and/or implementation of the FAQs and/or the 2017 Rule:  (1) *Texas Children's Hospital, et al. v. Burwell*, No. 14-cv-2060 (D.D.C.); (2) *Missouri Dept. of Soc. Servs. v. U.S. Dept. of Health and Human Serv's. et al.*, No. 1:15-cv-01329 (D.D.C.); (3) *Children's Hospital Assoc. of Texas et al. v. Price et al.*, No. 1:17-cv-00844 (D.D.C.); (4) *Kentucky Hospital, LLC, et al. v. Price et al.*, No.

13

1:17-cv-01201 (D.D.C.); and (5) *Colorado Hospital Assoc., et al. v. Hargan, et al.*, 1:17-cv-

02613 (D.D.C.).

59.     On December 29, 2014, this Court (Sullivan, J.) found that the plaintiffs in *Texas*

*Children's Hospital* were likely to succeed on the merits of their claim that the policy referenced

in FAQ No. 33, to the extent it requires the inclusion of private health insurance payments in the

calculation of the Medicaid Shortfall component of the hospital-specific DSH limit, is illegal and

void.  *Texas Children's Hosp.*, 76 F. Supp. 3d at 241.  The Court found that the plaintiffs were

likely to succeed on the merits of their claim that the rule referenced in FAQ No. 33 was a

substantive or legislative rule that CMS did not promulgate using notice-and-comment

rulemaking, in violation of the APA.  *Id.*  The Court ultimately enjoined CMS "from enforcing,

applying, or implementing FAQ No. 33" pending further order of the court.  *Id.* at 247.  Cross

motions for summary judgment were later filed in the *Texas Children's Hospital* litigation and

are pending before the Court.

60.     In the subsequent *Children's Hospital Assoc. of Texas ("CHAT")* action, the

plaintiffs asserted claims challenging the 2017 Rule as in excess of defendants' statutory

authority (in violation of Section 706(2)(C) of the APA), and as arbitrary and capricious (in

violation of Section 706(2)(A) of the APA).  Cross motions for summary judgment have also

been filed in the *CHAT* litigation and are pending.

61.     The additional cases before this Court related to the FAQs and/or 2017 Rule,

*Missouri Dept. of Soc. Servs.*, *Kentucky Hospital*, and *Colorado Hospital Assoc.*, have been

stayed pending resolution of the dispositive motions in *Texas Children's Hospital* and *CHAT*.

### DSH LITIGATION IN OTHER DISTRICTS

62.     Several other cases challenging the FAQs and/or the 2017 Rule have been filed in

federal courts outside of the District of Columbia, including at least the following:  (1) *New*

*Hampshire Hospital Assoc., et al. v. Burwell, et al.*, No. 15-cv-00460 (D.N.H.) (*"New Hampshire I"*); (2) *New Hampshire Hospital Assoc., et al. v. Price*, 1:17-cv-00349 (D.N.H.) (*"New Hampshire II"*); (3) *Children's Health Care d/b/a Children's Hospitals and Clinics of Minnesota, and Gillette Children's Specialty Healthcare v. Burwell et al.*, No. 16-cv-4064 (D. Minn.); (4) *Tennessee Hospital Association, Takoma Regional Hospital, Delta Medical Center, and Parkwest Hospital v. Burwell et al.*, No. 3:16-cv-03263 (M.D. Tenn.); (5) *Children's Hospital of The King's Daughters, Inc. v. Price et al.*, No. 2:17-cv-00139 (E.D. Va.); and (6) *Missouri Hospital Assoc. v. Price et al.*, No. 2:17-cv-04052 (W.D. Mo.).

63.     In *New Hampshire I*, the court granted summary judgment in the plaintiffs' favor on two counts, holding that:  (1)  "[b]ecause FAQs 33 and 34 are not regulations, in promulgating those FAQs, defendants acted 'in excess of statutory jurisdiction, authority ... or short of statutory right.' § 706(2)(C)"; and (2) "FAQs [33 and 34] are considered substantive rules, and should have been, but were not, promulgated through notice-and-comment rulemaking under the APA. Because of the lack of rulemaking procedure, FAQs 33 and 34 represent agency action that is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' § 706(2)(A), and 'without observance of procedure required by law.' § 706(2)(D)." *New Hampshire Hosp. Ass'n v. Burwell*, No. 15-CV-460, 2017 WL 822094, at *14 (D.N.H. Mar. 2, 2017).  The case is currently on appeal to the First Circuit.

64.     In *New Hampshire II*, the same plaintiffs challenged the 2017 Rule.  Summary judgment briefing is underway in that case.

65.     In *Children's Hosp. of the King's Daughters,* the United States District Court for the Eastern District of Virginia granted a preliminary injunction prohibiting enforcement of FAQ No. 33.  *Children's Hosp. of the King's Daughters, Inc. v. Price*, No. 2:17-cv-139, 2017 WL

2936801 (E.D. Va. June 20, 2017).  Analyzing the Medicaid statute in the course of its

discussion of the plaintiff's likelihood of success on the ultimate merits of their claims, the court

stated that:

> Congress elected to require that a provider subtract Medicaid payments from the
> HSL [hospital-specific limit], but made no mention of deducting private insurance
> payments. This silence is significant. The court cannot assume that Congress has
> omitted from statutory text a requirement that it intended to apply, particularly
> where the same statute includes different requirements.
>
> . . .
>
> Accordingly, as relevant here, the statute is unambiguous: private insurance
> payments made on behalf of Medicaid-eligible children whose care is not billed to
> Medicaid cannot be used to reduce DSH payments made to compensate a provider
> for the costs of treating Medicaid patients.

*Id*. at *8.  The preliminary injunction ruling was subsequently converted to a final

judgment, and the case is now on appeal to the Fourth Circuit.

66.     In *Tennesee Hosp. Assoc.*, the United States District Court for the Middle District

of Tennessee granted summary judgment on two counts in favor of the plaintiff hospitals

challenging FAQ Nos. 33 and 34.  *Tennessee Hosp. Assoc. v. Price*, No. 3:16-CV-3263, 2017

WL 2703540 (M.D. Tenn. June 21, 2017).  The court held that "Defendants' policies set forth in

the responses to FAQs 33 and 34 violate the APA because they conflict with the unambiguous

language of the Medicaid Act and the regulation quoted above [the 2008 Rule].  In addition, the

FAQ policies represent agency action that is arbitrary, capricious, an abuse of discretion,

otherwise not in accordance with law, and without observance of procedure required by law

because they were not promulgated pursuant to the required notice-and-comment rule-making

procedures."  *Id.* at *8 (internal footnote omitted).  The case is now on appeal to the Sixth Circuit.

67.     In *Children's Hosp. and Clinics of Minnesota*, the United States District Court for

the District of Minnesota resolved a summary judgment motion addressing FAQ No. 33 only,

and held that "because FAQ 33 alters the formula articulated in the 2008 Rule for calculating the hospital-specific DSH limit by requiring states to include private insurance payments, FAQ 33 is a substantive legislative rule that should have been, but was not, promulgated through the notice notice-and-comment rulemaking process required by the APA. . . . Consequently, Defendants violated the APA's procedural requirements by not using the notice-and-comment procedures, and FAQ 33 must be vacated because it is 'without observance of procedure required by law.' 5 U.S.C. § 706(2)(D)." *Children's Health Care d/b/a Children's Hosp. and Clinics of Minnesota v. CMS et al.*, No. 16-cv-4064, D.E. 78 at 18 (D. Minn. June 26, 2017). The case is currently on appeal to the Eighth Circuit.

68.     In *Missouri Hospital Assoc.*, plaintiffs filed a complaint challenging FAQ Nos. 33 and 34, which was later amended to add a claim challenging the 2017 Rule. Cross motions for summary judgment were subsequently filed. On February 9, 2018, the court granted summary judgment for the plaintiff on all counts, invalidating the 2017 Rule on substantive grounds, and the FAQs on both procedural and substantive grounds. The court held that the Medicaid Act "is unambiguous that the calculation of a DSH hospital's [hospital-specific limit ("HSL")] does not involve consideration of private insurance or Medicare payments, and a DSH hospital's total uncompensated costs of care for calculating the HSL is reduced only by the total of other Medicaid program payments." *Missouri Hospital Assoc.*, 2018 WL 814589, at *12. The court went on to hold that the 2017 "Final Rule is in excess of Defendants' statutory authority and the Final Rule is set aside." *Id.*

## PLAINTIFF'S CURRENT CIRCUMSTANCES

69.     On October 30, 2015, Texas HHSC notified DHR of the preliminary results of the federally-mandated audit of payments for the for the 2012 DSH year. On the same date, DHR responded with a letter stating that "Medicare payments for dual eligibles should not be included

in the hospital-specific calculation because such a methodology penalizes providers for caring

for low income populations and violates federal statute." DHR also requested that Texas

HHSC's audit be suspended pending resolution of the *Texas Children's Hospital* litigation as

well as administrative processes relating to a proposed amendment of the Texas State Plan.

70.     On December 3, 2015, Texas HHSC informed DHR that it could not grant DHR's

request to suspend the 2012 DSH audit "because doing so would place federal matching funds

for Texas' DSH program in jeopardy."

71.     On April 27, 2016, Texas HHSC notified DHR that the audit of payments for the

2012 DSH program year had determined that DHR had purportedly been overpaid in an amount

of at least $7,302,349. The notice contained a demand that DHR repay the overpaid amount

within 30 days or contact Texas HHSC to request a payment plan.

72.     In response, on May 20, 2016, DHR sent a letter to Texas HHSC Executive

Commissioner Chris Traylor in which it asserted that the hospital would not be subject to any

recoupment for 2012 DSH funds if Medicare payments for dual eligibles had not been

improperly included in the calculation of the hospital specific limit. In its letter, DHR asked

HHSC to delay taking steps to recoup the alleged overpayment until at least December 31, 2016.

73.     The Texas HHSC, in a letter dated October 6, 2016 (and subsequently revised and

replaced by a letter dated December 13, 2017), agreed to delay efforts to effectuate any

recoupment of the alleged 2012 DSH program overpayment amounts from DHR, but only

temporarily. Texas HHSC's December 13, 2017 letter provides that the recoupment will resume

on a highly expedited schedule if CMS defers or disallows federal funds to Texas on the grounds

that Texas has not recouped the alleged overpayment from DHR. Specifically, the letter

provides that: (1) within twenty business days after DHR's receipt of notice from Texas HHSC

of such a deferral or disallowance of federal funds, DHR must enter a repayment plan with Texas HHSC for the full amount of the alleged overpayment; (2) the schedule in the repayment plan will establish that at least half of the entire alleged overpayment must be paid within ten business days of the date of the repayment plan; and (3) the other half of the alleged overpayment must be paid no later than six months after the date of Texas HHSC's notice of deferral or disallowance.

74.     There is currently no administrative process or legal avenue through which plaintiff can appeal the recoupment, which will become imminent upon the issuance of such a notice from Texas HHSC, or upon the occurrence of certain other triggers set forth in the letter. Moreover, once such funds are recouped and redistributed, there is no mechanism to recover the funds paid to other hospitals by the state.   Thus, once the funds are taken, plaintiff will have no recourse to recover the DSH Payments even if plaintiff fully prevails on the merits of its suit.

75.     Accordingly, if that recoupment is permitted to occur, it will adversely affect DHR and will in all likelihood ultimately require DHR to cut programs and services to its patient populations, including programs and services it provides to Medicaid patients.

76.     The potential loss of over $7 million for the 2012 DSH program year represents an amount that DHR could use to cover the salaries of 95 nurses or 20 pediatric subspecialty physicians.  The same funds could be used to retain 235 Hospital Environmental Services workers, who perform an essential function as the first line of defense with respect to infection control.  This amount is also equivalent to the cost of replacing equipment in five catheterization laboratories which are needed to carry out critical cardiac treatments and diagnoses.

77.     In addition, application of the policies referenced in FAQ Nos. 33 & 34 and the 2017 Rule will also reduce by millions of dollars the amount of DSH funding plaintiff DHR may be entitled to receive in future years.  That DSH funding will be reallocated and forever lost to

DHR absent appropriate intervention to preclude the improper application of the policies in FAQ Nos. 33 & 34 and the 2017 Rule.  That unanticipated and irrevocable loss of significant additional funding will compound the irreparable harm DHR and its patient populations will face if FAQ Nos. 33 & 34 are permitted to stand.

## COUNT I

## Violation of 5 U.S.C. § 706(2)(C)

78.    Plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1 through 77.

79.    The Medicaid Act unambiguously sets forth the calculation to be used in determining the Medicaid Shortfall component of the hospital-specific DSH payment limit.  42 U.S.C. § 1396r-4(g)(1)(A).

80.    The Medicaid Act expressly provides that only "payments under this subchapter" are to be subtracted from the total costs of furnishing hospital services to individuals who are eligible for medical assistance under the State Plan.  *Id.*  "[T]his subchapter" refers to the Medicaid Act.  *See id.*

81.    The policies referenced in FAQ Nos. 33 & 34 and the 2017 Rule regarding the inclusion of private health insurance and Medicare payments in the calculation of the Medicaid Shortfall component of the hospital-specific DSH payment limit are contrary to the plain language of 42 U.S.C. § 1396r-4(g)(1)(A), which makes no mention of including private health insurance or Medicare payments in that calculation.

82.    Section 706(2)(C) of the APA requires a reviewing court to "hold unlawful and set aside" agency action "in excess of statutory jurisdiction, authority . . . or short of statutory right."  5 U.S.C. § 706(2)(C).

83.     In promulgating and enforcing the policies referenced in FAQ Nos. 33 & 34 and the 2017 Rule, the defendants acted in excess of their statutory jurisdiction, their statutory authority, and short of statutory right under the Medicaid Act.

84.     The policies referenced in FAQ Nos. 33 & 34 and the 2017 Rule are therefore unlawful and should be set aside under 5 U.S.C. § 706(2)(C).

## COUNT II

### Violation of 5 U.S.C. § 706(2)(A)

85.     Plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1 through 77.

86.     Section 706(2)(A) of the APA proscribes agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

87.     The policies referenced in FAQ Nos. 33 & 34 and the 2017 Rule regarding the inclusion of private health insurance and Medicare payments in the calculation of the Medicaid Shortfall component of the hospital-specific DSH payment limit are contrary to the plain language of 42 U.S.C. § 1396r-4(g)(1)(A), which makes no mention of including private health insurance or Medicare payments in that calculation.

88.     The policies referenced in FAQ Nos. 33 & 34 and the 2017 Rule are also contrary to the 2008 Rule, CMS's initial guidance, the form CMS has provided for the calculation of the hospital-specific DSH payment limit, and several federal court rulings.

89.     Thus, the policies referenced in FAQ Nos. 33 & 34 and the 2017 Rule are arbitrary, capricious, an abuse of discretion, and not in accordance with law.  They should therefore be vacated pursuant to 5 U.S.C. § 706(2)(A).

## COUNT III

### Violation of 5 U.S.C. § 706(2)(D)

90.     Plaintiffs reallege and incorporate by reference the allegations contained in
Paragraphs 1 through 77.

91.     After notice-and-comment rulemaking, defendant CMS adopted the 2008 Rule
implementing the DSH program audit and reporting provisions of the Medicaid Act.  42 U.S.C.
§ 1396r-4; 42 C.F.R. 447.299 (2008).  The 2008 Rule is unambiguous.  It expressly provided the
methodology for calculating the Medicaid Shortfall component of a DSH's hospital-specific
DSH payment limit as follows:  "the total cost of care for furnishing inpatient hospital and
outpatient hospital services to Medicaid eligible individuals . . . less the sum of regular Medicaid
FFS rate payments, Medicaid managed care organization payments, supplemental/enhanced
Medicaid payments[.]"  42 C.F.R. § 447.299(c)(16).

92.     Despite the existence of that unambiguous regulation, defendant CMS, without
providing notice or opportunity for comment, issued the policies referenced in FAQ Nos. 33 &
34, which require the inclusion of private health insurance and Medicare payments in the
calculation of the Medicaid Shortfall component of a DSH's hospital-specific DSH payment
limit.

93.     The policies referenced in FAQ Nos. 33 & 34 amended the unambiguous
substantive language of the 2008 Rule by adding private health insurance payments and
Medicare payments to the calculation of the Medicaid Shortfall component of a DSH's hospital-
specific DSH payment limit.

94.     The policies referenced in FAQ Nos. 33 & 34 constituted "final agency action for
which there is no other adequate remedy."  5 U.S.C. § 704.

95.     With respect to the time period from the issuance of the FAQ Nos. 33 and 34 until the effective date of the 2017 Rule (June 2, 2017), Defendants are enforcing the policies referenced in FAQ Nos. 33 & 34 by, among other things, requiring independent auditors to follow them in auditing states' compliance with the DSH program and seeking to recoup the purported overpayments those policies create.

96.     Section 706(2)(D) of the APA proscribes agency action that is "without observance of procedure required by law."  5 U.S.C. § 706(2)(D).

97.     The policies referenced in FAQ Nos. 33 & 34 regarding the inclusion of private health insurance and Medicare payments in the calculation of the Medicaid Shortfall component of a DSH's hospital-specific DSH payment limit had the force and effect of law.  As such, they were legislative rules that substantively amended the existing federal regulations without following the APA's notice-and-comment procedures.  *See* 5 U.S.C. §§ 553(b)-(d).

98.     Thus, the policies referenced in FAQ Nos. 33 & 34 constituted agency action taken without observance of procedure required by law.  They should therefore be vacated pursuant to 5 U.S.C. § 706(2)(D).

## PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully requests that this Court enter judgment in its favor, and:

A.     Declare that the policies referenced in FAQ Nos. 33 & 34 and the 2017 Rule that require inclusion of private health insurance and Medicare payments in the Medicaid Shortfall component of a DSH's uncompensated care calculation conflict with the unambiguous language of 42 U.S.C. § 1396r-4(g)(1)(A) and therefore violate the Medicaid Act;

B.     Declare that the policies referenced in FAQ Nos. 33 & 34 and the 2017 Rule that require inclusion of private health insurance and Medicare payments in the Medicaid Shortfall component of a DSH's uncompensated care calculation are in excess of the defendants' statutory jurisdiction, authority, or are short of statutory right and therefore violate the APA;

C.     Declare that the policies referenced in FAQ Nos. 33 & 34 and the 2017 Rule that require inclusion of private health insurance and Medicare payments in the Medicaid Shortfall component of a DSH's uncompensated care calculation are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law and therefore violate the APA;

D.     Declare that the policies referenced in FAQ Nos. 33 & 34 that require inclusion of private health insurance and Medicare payments in the Medicaid Shortfall component of a DSH's uncompensated care calculation were imposed without observance of procedure required by law and therefore violate the APA;

E.     Order defendants to notify Texas's Medicaid program that the enforcement of the rules referenced in FAQ Nos. 33 & 34 and the 2017 Rule that require inclusion of private health insurance and Medicare payments in the Medicaid Shortfall component of a DSH's uncompensated care calculation is enjoined and that defendants will take no action to recoup any federal funds provided to Texas or to penalize Texas in any way for its noncompliance with those policies;

F.     Vacate the policies referenced in FAQ Nos. 33 & 34 and the 2017 Rule that require inclusion of private health insurance and Medicare payments in the Medicaid Shortfall component of a DSH's uncompensated care calculation;

G.     Permanently enjoin the defendants from enforcing, applying, or implementing (or requiring states to enforce, apply, or implement) the policies referenced in FAQ Nos. 33 & 34 and the 2017 Rule that require inclusion of private health insurance and Medicare payments in the Medicaid Shortfall component of a DSH's uncompensated care calculation;

H.     Award plaintiff DHR its reasonable attorney's fees and costs pursuant to 28 U.S.C. 2412(d)(1)(A); and

I.      Grant such further relief as the court deems just and necessary.

Respectfully submitted,

**PLAINTIFF DOCTORS HOSPITAL AT RENAISSANCE**

By Its Attorneys,

**DENTONS US LLP**

Dated:  February 21, 2018          s/ Drew W. Marrocco
Drew W. Marrocco (Bar No. 453205)
1900 K Street NW
Washington, DC 20006
(202) 496-7500
drew.marrocco@dentons.com